Hillsborough,
No. 5199.

ABBIE M. PETERSON, *Ex'x & a.*

*v.*

JOHN J. REILLY, INC. *& a.*

Argued February 5, 1964.
Decided April 24, 1964.

*McLane, Carleton, Graf, Greene & Brown, Jack B. Middleton* and *Harkaway & Pappagianis* (*Mr. Stanley M. Brown* orally), for the plaintiffs Abbie M. Peterson, executrix, Powers Regulator Company, Corriveau-Routhier, Inc., C. J. Bosselli, Dorothy C. Spear, executrix, Scovell Wellington & Co. and Bloom, South & Gurney.

*Wiggin, Nourie, Sundeen, Nassikas & Pingree* (*Mr. John N. Nassikas* orally), pro se, and for Warren N. P. Wurm and Marjorie F. Wurm, mortgagees.

*Fisher, Parsons, Moran & Temple* (*Mr. Harold D. Moran* orally), for Joseph Michael Realty Corporation, mortgagee.

*James M. Winston,* Trustee in Bankruptcy (by brief and orally), pro se.

*Devine, Millimet, McDonough, Stahl & Branch* and *Green, Green, Romprey & Sullivan* (*Mr. Norman H. Stahl* orally), for Lyons Iron Works, Inc., John J. Reilly, Inc. and Thomas F. O'Brien, sheriff.

*Emile R. Bussiere* (by brief and orally), for Bertrand P. Cote, and Attilio and Gladys Baldini.

*King & Nixon* for P. H. McGranahan, *Samuel A. Margolis* for A. W. Therrien Co., *Hamblett, Kerrigan & Hamblett* for James Linatsas, and *Manning & Sullivan* for Lane Fearon, furnished no briefs.

DUNCAN, J. The decree in this case determines the relative priority of eighteen claims to the fund in the custody of the court, on the basis of evidence presented over a period of twelve days of trial. The issues presented, however, lie in comparatively narrow compass. They relate primarily to the status of a second mortgage given to secure the payment of $40,000, referred to as the Wurm mortgage, and a third mortgage given to secure the payment of $75,000 known as the Michael mortgage. Both mortgages were to secure advances made by stockholders, officers, and directors of the mortgagor corporation. At the trial, the plaintiffs contended that neither mortgage was valid against their respective claims. The master ruled that the second mortgage had priority over subsequent attaching creditors to the extent of $9,000 and the third mortgage to the extent of $8,000. This the mortgagees contend was error.

The findings and rulings to which the mortgagees excepted can best be understood in the light of factual background concerning the mortgaged property. Certain pertinent facts were found by the master as follows:

"On December 12, 1955 a written agreement was entered into between Mildred A. Gould and Thomas D. Gould as Sellers, and J. N. Anton and Warren N. P. Wurm as Buyers, by the terms of which the Buyers were to acquire all of the outstanding stock of the Rice-Varick Hotel, Inc. for the sum of $108,000. Instead of paying this amount, however, the Buyers agreed to pay down only $7,500 in cash, and the balance was to be satisfied, first, by paying or causing to be made available to the corporation $40,000 for the purpose of settling outstanding liabilities of the corporation on or before February 14, 1956; and, second, by causing the corporation to deliver to the Sellers, notes for the balance of $60,500 to be secured by a first mortgage on real estate of the corporation . . . Transfer was to be completed February 14, 1956.

"Although Joseph Michael Jr. did not sign the agreement it was understood that he was to acquire one-third of the stock, and that Wurm and Anton were each to have one-third.

"The transfer was effected on February 14, 1956, and at a meeting of stockholders of Rice-Varick Hotel, Inc. held on that day, J. Nossiff Anton, Warren N. P. Wurm and Joseph E. Michael were elected directors, the others having resigned, and execution of a note and mortgage to Mildred A. and Thomas D. Gould was authorized . . . Apparently the liabilities of the corporation at that time were $39,500 instead of $40,000 so the mortgage was given for $61,000. This note and mortgage, which was recorded in Book 1456, Page 420, after various assignments endorsed thereon . . . was, on February 20, 1957, assigned to the Merchant's Savings Bank. No one questions the validity of this mortgage to which the sheriff's sale was made subject, so the holder of the mortgage has no claim to the fund held by the Court.

"Wurm, Anton and Michael then on February 14, 1956 withdrew $7,500 from the corporation to make the down payment on the purchase of the stock . . . so at this point they had acquired an equal interest in all of the stock of Rice-Varick Hotel, Inc. without having invested any of their own money."

The new stockholders thereafter embarked upon an extensive program of expansion and modernization of the hotel. In October 1956 a new dining room was opened on the first floor, while extensive remodeling continued elsewhere. Eventually financial support was exhausted, disagreements arose among the stockholders, numerous attachments were made late in 1957 and early

1958, the corporation was adjudicated a bankrupt on February 24, 1959, and the hotel was sold on execution on April 6, 1959. *Wurm* v. *Reilly*, 102 N. H. 558.

Renovation of the hotel by the stockholders had been in progress for more than a year when the second mortgage dated and executed on April 1, 1957 and recorded on May 13, 1957, was given to the Wurms to secure the payment of $40,000, the borrowing having been authorized by the vote of the directors on March 28, 1957. Later, on October 15, 1957, a half interest in this note and mortgage was assigned to the Michael Realty Corporation. Joseph E. Michael, Jr. was a stockholder, director, treasurer and clerk of Michael Realty Corporation, as well as of Rice-Varick Hotel, Inc. The master held that the second mortgage was valid only to secure an advance by the Wurms in the amount of $9,000 made under date of March 27, 1957.

The third mortgage was authorized by vote of the directors on September 11, 1957 and given to Michael Realty Corporation and the Wurms purportedly to secure a note of $75,000. It was dated September 12, 1957, and recorded on November 4, 1957. In fact it secured a note for $40,000 payable to the Wurms, and another note for $35,000 payable to Michael Realty Corporation both dated September 12, 1957. It was expressly made subject to the second mortgage. The third mortgage was held valid by the master only to secure advances totaling $8,000 made by Wurm on September 9 and 11, 1957. Although both mortgages provided for interest at a higher rate, the master ruled that interest should be allowed at 6% only.

The claims of three creditors, namely the mechanic's lien creditors Lyons and Reilly and the attachment creditor Peterson, were prior in time to the second mortgage and were held to have priority over it. The attachments of all other creditors were subsequent in time to the date of execution of the third mortgage, but the attachments of Linatsas and Powers Regulator were made prior to the recording of that mortgage. However, since the third mortgage expressly provided that it was subject to the second mortgage, the attachments of creditors subsequent in time to the second mortgage, to the extent that they secured claims equal in the aggregate to the amount of that mortgage less $9,000, were held to have priority over the $8,000 security validly furnished by the third mortgage. The remaining attaching creditors, with claims aggregating more than $53,000, were held to have priority over the balances of the second and third mortgages.

The claims thus allowed against the fund, including the $17,000 of mortgage principal indebtedness, but exclusive of interest and costs totaled $128,176.65.

In accordance with established law in this jurisdiction, the master considered that the transactions between the corporation and its directors whereby the interests of the latter were advanced were subject to scrutiny (*Rosenblum* v. *Company*, 99 N. H. 267) and that if the corporation was insolvent at the time, its assets were a trust fund for its creditors, so that attempted preferences in favor of the directors would be invalid. *Smith* v. *Putnam*, 61 N. H. 632; *Mica Products Co.* v. *Heath*, 81 N. H. 470; *Bailey* v. *Ballou*, 69 N. H. 414, 415. See 15A Fletcher, Cyc. Corporations (1938 rev. vol.) *s.* 7469; *Boyum* v. *Johnson*, 127 F. 2d 491, 494 (8th Cir. 1942); *Woodman* v. *Butterfield*, 116 Me. 241, 248.

RSA 545:4 provides: "Conveyance, by insolvent. Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration." "Fair consideration" is defined by RSA 545:3 II as follows: "Fair consideration. Fair consideration is given for property or obligation: . . . II. When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained."

The master found, over the contrary contention of the mortgagees that upon the evidence, "as of April 1, 1957 . . . Rice-Varick Hotel Inc. was insolvent within the meaning of RSA 545:2 I, and also within the provisions of the Bankruptcy Act (11 U.S.C.A., *s.* 1 (19)), and RSA ch. 568." He further found that as of April 1, 1957, the corporation "could not pay its bills as they matured, and if that test should be applied the corporation was insolvent."

In reaching this conclusion the master relied upon evidence indicating that the value of the assets of the corporation following its acquisition by Wurm, Michaels, and Anton was "zero," evidence indicating that at June 30, 1957 its liabilities exceeded its assets, and evidence that its operations for the year preceding that date showed a loss before depreciation. We are satisfied from examination of the record that it supports the findings of the master.

While the master recognized that under RSA 545:3 II, *supra*, antecedent debts, as well as a present advance may constitute "fair consideration" to sustain a conveyance by an insolvent debtor, he was unable to determine upon the evidence what prior payments by Wurm were made as loans to be secured by the second mortgage, and what were on account of obligations arising from the original stockholders' agreement to pay accrued liabilities of the corporation existing when its stock was acquired. In the light of further evidence of withdrawals by Wurm he concluded that the "net amount advanced was disproportionately small as compared with the face amount of the mortgage," and ruled that in determining what were "present" advances, only advances made to the date of the mortgage should be considered. He found that in the period just before and after the giving of the second mortgage, Wurm made certain advances to the corporation between March 11, 1957 and May 6, 1957. Of these advances, only one for $9,000 made either on March 27, 1957 (the day before authorization of the borrowing by the directors) or on March 28, 1957 was found to be "near enough in point of time and under the circumstances . . . to be contemporaneous" or a present advance. RSA 545:3 II, *supra*; *Stavers* v. *Philbrick*, 68 N. H. 379; Annot. 31 A.L.R. 2d 663.

The master was "not convinced" that there was any obligation upon Wurm to make future advances upon the security of the mortgage (RSA 479:3, 5) and concluded rather that he "paid money into the corporation from time to time as needed without any agreement or plan." Accordingly he ruled that the mortgage was valid as against creditors "only to the extent of $9,000." RSA 545:3, 4, *supra*.

Under the decided cases, a future advance which is made pursuant to a contractual obligation to make it, entered into when a mortgage is executed, is secured thereby and takes priority over intervening liens. *Peaslee* v. *Evans*, 82 N. H. 313; *Messier* v. *Ledoux*, 86 N. H. 115. However where the subsequent advance is optional, the mortgage does not become security until the advance is made, and it is then subject to liens which have intervened. See *Virgin* v. *Britton*, 80 N. H. 340; *Mica Products Co.* v. *Heath*, 81 N. H. 470, 472, *supra*; Upton, The Real Estate Mortgage for Future Advances, 5 N. H. B. J. 70 (Jan. 1963). In any case, some proof that the advance was a part of the mortgage debt must be a prerequisite to a secured position.

The finding of the master in this case that there was no agree-

ment with the corporation that Wurm would make future advances under the second mortgage is sustainable upon the record. It is plain that the mortgage itself contained no such obligation.

It is also evident from the findings of the master that the mortgagee failed to sustain his burden of establishing that moneys advanced after the mortgage was executed were loans intended to be secured thereby. The record did not compel a different finding. Hence the finding and ruling that only the advance of $9,000 was entitled to security under the mortgage cannot be held erroneous as a matter of law. *Bean* v. *Quirin*, 87 N. H. 343, 347; *Albert Richards Co.* v. *Mayfair, Inc.*, 287 Mass. 280, 289-290. See *Ackerbaum* v. *Gracelyne Fashions, Inc.*, 267 App. Div. 119, 121, aff'd 293 N. Y. 834.

The mortgagee Wurm and his assignee assert that the findings and rulings of the master were erroneous in several specific respects. It is contended that it was error to conclude that the corporation was insolvent on April 1, 1957, because gross investment increased by $554,000 from June 30, 1956 to November 30, 1957 and an operating statement for the period December 1, 1957 to May 31, 1958 showed a small net operating profit. However, liabilities increased during the period ending November 30, 1957 by substantially more than the investment did, and the subsequent profit could be found to be without real significance. It is further argued that the notes totaling $115,000, secured by the two mortgages should not have been taken into account as liabilities as of April 1, 1957, and that other liabilities secured by the personal guarantees of individual stockholders should also have been laid aside.

The circumstances that the mortgage notes were not payable for two years and one year from their respective dates, did not render them any less liabilities of the corporation. RSA 545:1, 2 I; 568:14; *Hinds* v. *Heath*, 68 N. H. 551. It seems plain that other liabilities, guaranteed by the stockholders, were nonetheless liabilities of the corporation, which if paid by the guarantors would merely have become corporate obligations to the guarantors instead of the original creditors.

While the arguments with regard to the corporate statements for periods after April 1, 1957 may possibly serve to indicate that a finding of insolvency on April 1, 1957 was not compelled by the evidence, they fall short of establishing that such a finding was erroneous as a matter of law. As the master correctly

ruled, the burden of proof was upon the mortgagees. He found that the testimony of Wurm concerning the value of the assets on April 1, 1957 was "not helpful [to establish that it exceeded book value] even if credible." The question of solvency was one of fact, and the finding of the master is conclusive since there was evidence to support it.

The mortgagee Wurm further contends that the master erred in not giving greater weight to the fact that even if technically insolvent on April 1, 1957 the corporation was a going concern, "continuing its business with some expectation and a reasonable prospect of being able to continue the corporate enterprise." 13 Am. Jur., Corporations, s. 1261. See *Sanford Tool Co.* v. *Howe, Brown & Co.*, 157 U. S. 312; Annot. 158 A.L.R. 968. The master considered this argument, and concluded that the "extension" thus advocated "does not appear to be the law in New Hampshire." *Bailey* v. *Ballou*, 69 N. H. 414. Conceding that the corporation on April 1, 1957 had not suspended business, the conclusion that as of that date it had a reasonable prospect of completing its projected renovations with ultimate success in its operations was clearly not a compelled conclusion. The single fact that operations were continuing on April 1, 1957, cannot be held to invalidate the findings of the master. RSA 545:5. See *Albert Richards Co.* v. *Mayfair, Inc.*, 287 Mass. 280, *supra*. In effect the mortgagees would have us hold that their claims should be granted priority in furtherance of a policy to encourage corporate directors and stockholders to make advances to doubtful enterprises in an effort to achieve success. We do not conceive that any public policy supports this argument as applied to an enterprise, the assets of which have been derived in substantial part from creditors whose claims will remain unsatisfied.

Other arguments advanced by the mortgagees revolve around questions of fact determined adversely to their contentions by the master. They disclose no errors of law. We see no error in the master's ruling that findings as to the value of the corporate stock made in other litigation, between the stockholders *inter se*, were immaterial in the proceedings before the master. *Arlington Mills* v. *Salem*, 83 N. H. 148, 159; *Am. Motorists Ins. Co.* v. *Garage*, 86 N. H. 362, 371.

The findings and rulings of the master with respect to the third mortgage paralleled those relating to the second. Certain antecedent advances were claimed by Michael Realty Corpora-

tion to be secured by the corporate mortgage, although there was evidence that a note of the individual stockholders had been given therefor. There was evidence of other advances, totaling $15,000, made in September and October, after execution of the third mortgage but before the assignment to Michael Realty on October 11, 1957 of a one-half interest in the second mortgage for $40,000. But it was claimed that still other funds were used "for the alleged purpose of buying $20,000 participation in the second mortgage." In this connection the master found that "it does not appear that any money was paid to Wurm [for the assignment] although it was claimed that Wurm had already advanced $40,000" under the second mortgage. Other advances, in varying amounts, from a fund deposited in a Massachusetts bank were made by Michael Realty "to various payees," more than a month after the third mortgage was executed.

The evidence did not compel a finding that the advances relied upon by Michael Realty as evidence of loans to the corporation under the third mortgage were in fact established to be such, or that they were entitled to priority because secured thereby. With respect to these advances, the master had this to say: "Out of this confusion it is extremely difficult to determine what funds should be considered as having been advanced to Rice-Varick Hotel Inc. as the $35,000 secured by the third mortgage." The third mortgage, like the second, was held to be invalid as security for subsequent or future advances (RSA 479:3), and its principal amount of $75,000 was found to be disproportionate to a present advance by Wurm of $8,000 and alleged antecedent payments by Michael of $15,000 if in fact the latter were advances to the corporation. RSA 545:3 II. Hence the third mortgage was held to be valid as against creditors only to the extent of $8,000 advanced by Wurm on September 9 and 11, 1957. *Stavers* v. *Philbrick*, 68 N. H. 379. Other advances by Wurm on September 16 and 18, 1957, totaling $12,000 cannot be held as a matter of law to have been loans secured by the mortgage of September 12, 1957 (RSA 479:3 *supra*), and therefore entitled to priority. Nor can the fact that this mortgage was also withheld from recording for a substantial period of time be relied upon as conclusive evidence that all advances before recording were before "delivery" of the mortgage within the meaning of RSA 479:3, *supra*.

The exceptions of the mortgagees Warren N. P. and Marjorie

F. Wurm, and Joseph Michael Realty Corporation are overruled.

The appointment of the Trustee in Bankruptcy, James M. Winston, became effective July 17, 1959, when he succeeded the original Trustee. Sale of the hotel property had previously taken place on April 6, 1959, after the Referee in Bankruptcy on March 30, 1959 had denied a petition seeking to enjoin the sale, and the District Court on April 2, 1959 had refused to review the Referee's order.

On August 3, 1959, the Trustee entered his appearance in the proceedings now before us. Following a hearing in the Superior Court on October 19, 1959, at which consideration was given to the appointment of a master, the Trustee advised the Court under date of October 20, 1959 that he had no objection to "referral . . . of all questions concerning the validity and priority of mechanic's liens . . . nor . . . to a distribution of the proceeds (resulting from the sale) . . . in accordance with the master's ruling on the mechanic's liens." At the same time the Trustee "reserved [his] right and claim to any funds that may remain after payment of such liens . . . ."

On February 6, 1961, the master heard a petition for the allowance to counsel for J. J. Reilly, Inc. and Lyons Iron Works of counsel fees arising out of the sale of the hotel property on execution, and the related litigation in the bankruptcy court, and in the Superior and the Supreme Court when it was sought to have the sale set aside. *Wurm* v. *Reilly*, 102 N. H. 558, *supra*. Under date of August 29, 1961 the master ruled that the fees and expenses of counsel "totaling $5,804.91 shall be paid out of the funds in the hands of the Superior Court and shall have priority over all claimants to the fund." The claim was given first priority in the master's report filed March 27, 1962. At a later hearing on a motion for payment of the fees, the Trustee on September 14, 1962 stated to the court that he had no objection to the payment of the fees, "but only to interest thereon."

On October 3, 1962, however, the Trustee moved for leave to retract his consent to payment of counsel fees, and to except to the master's recommendation that they be allowed, upon the ground that the fund derived from the sale on execution, after the payment of the judgments of the two execution creditors, was by virtue of RSA 529:25 the property of the bankrupt. At the same time, the Trustee moved that the balance of the fund be paid to him as Trustee.

The master thereafter recommended that both motions be

denied, and that "if and when it is determined" that there is a balance in the fund after the payment of the claims allowed by the master, the Trustee be afforded an opportunity to present evidence of the existence of valid claims of other creditors, for the purpose of establishing their priority over the claims of mortgagees to the balance of the fund.

These recommendations were approved by the Superior Court, and decrees were entered accordingly. The exceptions of the Trustee to this disposition of his motions are here presented.

The Trustee has grounded his objection to the payment of fees to counsel and of interest and costs to creditors having prior or secured claims upon the provisions of RSA 529:25. This statute provides in substance that the residue, if any, of the proceeds of an execution sale, after the satisfaction of executions in the hands of the sheriff, "shall be paid to the debtor." We are of the opinion that the master correctly ruled that the statute does not require payment to the Trustee "until satisfaction of all outstanding liens, mortgages or other claims against the fund which may be found to have priority in this proceeding." See *Manchester Sav. &c. Ass'n* v. *Emery-Waterhouse*, 102 N. H. 233. While the Trustee succeeded to the interest of the bankrupt in the proceeds of the sale of the hotel, that interest was subject to the claims of the lien holders who are parties to this proceeding. *State* v. *Ingalls*, 105 N. H. 244. The fund was paid into court on order of the Superior Court made on June 24, 1959, pending adjudication of the several claims thereto. In view of this circumstance, the exception in the interest statute (RSA 524: 1-a (supp)) making it inapplicable where the "party to be charged" has paid the money into court under the rules of court does not apply to this case. For like reasons we think that Rules 46 and 47 of the Superior Court (99 N. H. 614, 615) have no bearing upon the rights of the parties in these proceedings.

The proceedings which culminated in the execution sale of the hotel originated long prior to bankruptcy. The circumstances were such that the Referee in Bankruptcy was without jurisdiction to enjoin sale on execution, or other pending in rem proceedings. *Goodman* v. *Michael*, 280 F. 2d 106, 108 (1st Cir. 1960); 1 Collier on Bankruptcy (14th *ed.*) s. 2.63, *p.* 330. See *Straton* v. *New*, 283 U. S. 318; 41 Yale L. J. 445. The Trustee properly consented to orderly disposition of the pending proceedings in the state courts, at the same time reserving his rights in any balance. No contention is now advanced that

he has "abandoned" any asset so as to leave the bankrupt free to assert title to any balance which may remain after the satisfaction of in rem claims. See 4 Collier on Bankruptcy (14th *ed.*) *s.* 70.42. The Trustee's motions of October 3, 1962 were properly denied. *Burns* v. *Artcraft Painting Co.*, 103 N. H. 118.

The Trustee's argument with respect to the allowance of interest, and costs, that general creditors who are not parties to these proceedings should not have their claims thus diminished since the delay has been occasioned by acts of the law, finds support in the general rule that post-bankruptcy interest will not be allowed on preferred claims unless the principal amounts of all claims are first paid in full. See 9 Am. Jur. 2d Bankruptcy, *s.* 533, *p.* 413; Annot. 69 A.L.R. 1210. The rule with respect to secured claims, such as are here involved, is otherwise however where the security is adequate to pay interest as well as principal, as it is under the master's decision. 9 Am. Jur. 2d Bankruptcy, *s.* 483, *pp.* 374, 375; Annot. 27 A.L.R. 2d 586, 592-596. See *Vanston Committee* v. *Green*, 329 U. S. 156, 164-165. No costs have been allowed to the mortgagees, and their interest rate was cut to six per cent. Allowance of costs to the other parties was authorized by RSA 525:1, and they have agreed to waive any claim to interest after June 29, 1959 in excess of the interest earned by the fund on deposit. The Trustee's exception to the allowance of interest and costs is therefore overruled.

The exception to the allowance of counsel fees, to counsel for the execution creditors, is in our judgment without merit. The jurisdiction of the state court, which attached before the bankruptcy proceedings were instituted, carried with it as an incident thereto the right to adjudicate the claims of counsel for services rendered in the state court proceedings. *Sherman* v. *Buckley*, 119 F. 2d 280 (2d Cir. 1941), *cert. den.* 314 U. S. 657. Having instituted the proceedings which produced the fund in question, and having taken appropriate steps to preserve and protect the fund, the execution creditors were properly held entitled to have paid from the fund the fees and disbursements of counsel which inured to the benefit of other interested parties. *Manchester Sav. & Ass'n* v. *Emery-Waterhouse*, 102 N. H. 233, *supra*, 239. See *Guay* v. *Association*, 87 N. H. 216, 221-222; *Concord Nat. Bank* v. *Haverhill*, 101 N. H. 416.

The exceptions of the Trustee in Bankruptcy are overruled. His rights with respect to any surplus remaining after payment

of the claims allowed in these proceedings are preserved by the decree of the Superior Court of April 12, 1963, expressly reserving for future determination any issue between him and the mortgagees with respect to that balance.

The exception of the legal firm of Wiggin, Nourie, Sundeen, Nassikas & Pingree was taken to the ruling that their lien as attorneys upon the sums allowed as prior claims to the mortgagees Wurm is "limited to legal fees and disbursements . . . to the extent includable in taxable costs [such] lien to have priority over the claims of Attilio Baldini and Gladys Baldini based upon trustee process and attachment of the interest of [the Wurms] in the fund now in the hands of the Clerk of Court." The master found that the Baldini trustee process was served in March 1959, and that John Nassikas, Esq. filed his appearance for the Wurms on June 10, 1960. While counsel for the Baldinis disagrees with the ruling of the master, he appears in the appellate proceedings solely to resist the claim that the attorney's lien should extend to the full amount of the claim for legal services amounting to $7,500, and have priority over the Baldini judgment in the sum of $6,250 plus interest.

Counsel claiming the lien concede that under the decided cases, an attorney's charging lien in this jurisdiction was at common law limited to taxable costs and disbursements. *Whitcomb* v. *Straw*, 62 N. H. 650; *Wells* v. *Hatch*, 43 N. H. 246, 247; *Currier* v. *Boston & Maine Railroad*, 37 N. H. 223, 227. The effect of this was to limit the lien for an "attorney's fee" to the taxable amount of $1.00. RSA 525:13. *Guay* v. *Association*, 87 N. H. 216, 221. See Abbey, Taxation of Costs in New Hampshire, 5 N. H. B. J. 114, 118 (April 1963). Wentworth, Attorneys' Liens, 35 Conn. Bar J. 191 (1961).

The claimants contend that the decided cases, besides being based upon a misapprehension of the effect of the prior English law, are archaic, the latest case having been decided in 1883 (*Whitcomb* v. *Straw*, *supra*) and that they are now superseded by statutory provisions enacted in 1963, which should control the decision of this case. RSA 311:13 (supp); Laws 1963, c. 89. *Cf.* Mass. G. L. Annot., *c.* 221, *s.* 50; *Murphy* v. *Brilliant Co.*, 323 Mass. 526, 532. See Black, Attorneys' Liens in Massachusetts, 24 B.U. L. Rev. 224 (1944); Black, Attorneys' Liens in Massachusetts, 43 Mass. L. Q. No. 3, *p.* 32 (Oct. 1958). If the statute is held to be inapplicable, we are urged to follow the course adopted by the Vermont court in *Weed* v. *Boutelle*, 56

Vt. 570, and to hold that an attorney's lien extends to the fair value of legal services rendered in the particular proceeding.

The short answer to the arguments of counsel for the Wurms is that any attorney's lien under the statute attaches no earlier than the date of entry of the appearance of counsel (RSA 311:13 (supp) *supra*), which in this case was a substantial time after the lien of the Baldinis attached to the interest of the Wurms in the fund now in question. It follows that any attorney's lien for legal services is junior to that of the Baldinis, as the master ruled. *Whitefield &c. District* v. *Bobst*, 93 N. H. 229; *Fornoff* v. *Smith*, 281 Ill. App. 232; *Weed* v. *Boutelle*, 56 Vt. 570, *supra*, 577, 581-2.

In the circumstances, it becomes unnecessary for us to decide the academic question of whether the attorney's lien extends to any balance of the Wurm claim under the second mortgage remaining after satisfaction of the Baldini judgment since other parties will not be affected. Nor is there any reason for us to consider here the claim of Bertrand Cote, on whose behalf a brief has been filed, since the master's ruling that he is entitled to satisfaction of his claim from the fund in court is not modified by this opinion.

*Exceptions overruled.*

All concurred.